**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DEBORAH A. ALESIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 16 CV 9806** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge:

Plaintiff Deborah Alesia ("Claimant") seeks reversal of the final decision of the Commissioner of Social Security ("the Commissioner") denying, for a third time, her claim for disability insurance benefits ("DIB"). The Commissioner has filed a motion for summary judgment asking the court to uphold the decision of the Administrative Law Judge ("ALJ"). For the reasons set forth below, Claimant's request for reversal (Dkt. 22) is granted insofar as it requests remand for further proceedings, and the Commissioner's motion for summary judgment (Dkt. 23) is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Opinion.

**I. Background**

Claimant's claim for disability benefits is before this District Court for a third time. *See Alesia v. Astrue (Alesia I)*, 789 F. Supp. 2d 921 (N.D. Ill. 2011); *Alesia v. Colvin*

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

*(Alesia II)*, No. 12 C 8395, 2015 WL 5062812 (N.D. Ill. Aug. 26, 2015).  As such, the Court will only discuss those background facts relevant to the issues before it; additional background is set forth in the Court's prior opinions.  *See Alesia I*, 789 F. Supp. 2d at 924-29; *Alesia II*, 2015 WL 5062812, at *1-4.

### A.  Procedural History

On November 24, 2006, Claimant filed an application for DIB.  (R. 62.)  Claimant alleged that she became disabled on November 3, 2006 due to fibromyalgia, insomnia, hypoglycemia, hyperthyroidism, gastroesophageal reflux disease, depression, herpes simplex two, restless leg syndrome, chronic systemic yeast overgrowth, irritable bowel syndrome, and fatigue.  (R. 62, 68, 193.)  The claim was denied initially (R. 64-68), and upon reconsideration.  (R. 70-72.)  Thereafter, Claimant requested a hearing before an ALJ (R. 73-76), which was held was held on July 14, 2009 before ALJ Joel G. Fina.  (R. 27-61.)  Claimant, who was represented by counsel, appeared and testified.  A vocational expert ("VE") also offered testimony.  On September 2, 2009, ALJ Fina issued a decision denying Claimant's application for DIB.  (R. 11-26.)  The Appeals Council denied review on April 28, 2010, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 1-3); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998).  Claimant sought review in this Court, and on May 24, 2011, Magistrate Judge Denlow granted Claimant's motion for summary judgment and remanded the action for further proceedings (*Alesia I*).  (R. 750-76.)

On July 3, 2012, a second administrative hearing was held (this time, before ALJ Victoria A. Ferrer).  (R. 920-63.)  Claimant testified again , as did a VE.  On August 10, 2012, ALJ Ferrer denied Claimant's claim for DIB.  (R. 677-95.)  Claimant declined to

file exceptions to the decision with the Appeals Council, making the ALJ's decision the final decision of the Commissioner. (R. 1143); 20 C.F.R. § 404.984(d). Claimant again sought judicial review in this Court, and on August 26, 2015, District Judge Feinerman granted Claimant's motion for summary judgment and remanded the action for further proceedings (*Alesia II*). (R. 1143-62.)

On June 29, 2016, a third administrative hearing, and the second before ALJ Ferrer, was held. (R. 1001-24.) Once again, Claimant appeared with counsel and testified. A VE also appeared, but she did not testify. On August 10, 2016, ALJ Ferrer issued a written decision denying Claimant's claim for DIB. (R. 884-918.) Claimant again eschewed review by the Appeals Council. This action followed.

### B. Relevant Medical Evidence

#### 1. Fibromyalgia Treatment Centers of America

From September 2003 until July 2006, Claimant was treated for fibromyalgia at the Fibromyalgia Treatment Centers of America ("FTCA").[2] *Alesia I*, 789 F. Supp. 2d at 926. During that time, Claimant attended regular check-up appointments, participated in controlled exercises and trigger point therapy, and received various medications for her ongoing symptoms. *Id.*

Claimant was primarily treated by Dr. Michael McNett, the medical director of FTCA. (*See, e.g.*, R. 287-93, 298-99, 301-25, 329-33, 336-48, 385, 409-10, 412-14.) During this treatment, Dr. McNett offered six medical assessments. In three Health Care Provider Certifications—completed in January 2004, September 2004, and January 2005—Dr. McNett opined that, due to Claimant's fibromyalgia, it was necessary

---

[2] FTCA was formerly known as the Paragon Clinic. (R. 50, 410, 412.)

for her to work only intermittently or to work on a less than full schedule. (R. 398-406.) In a June 2005 Attending Practitioner's Statement, Dr. McNett opined that Claimant was totally disabled from all job duties and incapable of minimum (sedentary) activity. (R. 395.) A month later, Dr. McNett opined in a July 2005 General Assessment Form for a life insurance company that Claimant had cognitive and exertional restrictions and could only return to light or sedentary work on a part-time basis. (R. 490-92.) And, in March 2006, Dr. McNett completed a Medical Certification Form in which he opined that Claimant's condition and treatment plan would result in absences from work. (R. 495.)[3]

In July 2005, Angelique Mizera, D.O., also from FTCA, performed an initial osteopathic evaluation of Claimant. (R. 391-94.) Dr. Mizera opined that Claimant "[m]ay return to work at her sedentary job provided she has good ergonomic support around her desk and computer, and she is able to take intermittent breaks for stretching and self-care as needed." (R. 394.)

### 2. John K. Hong, M.D.

Although Claimant was happy with her care at FTCA, the facility was far from her home. (R. 610.) Seeking a closer facility for her fibromyalgia treatment, Claimant began seeing Dr. John Hong, a pain management specialist, in September 2006. (R. 610, 618.) From September 2006 through May 2007, Claimant visited Dr. Hong and received trigger point injections. (R. 610, 612-22, 1530.) Although the trigger point injections would relieve Claimant of her pain, the pain would return two to four weeks later. (R. 612-14.)

---

[3] The Court will hereafter refer to these assessments as "reports" and identify them by their date.

In April 2007, Dr. Hong wrote a letter to the Bureau of Disability Determination Services. (R. 610-11.) He reported that Claimant had a long history of fibromyalgia characterized by "diffuse pain, numerous trigger points, as well as lumbar and cervical pain," and that trigger point injections provided "temporary, symptomatic relief of her muscle related pains." (R. 610.) Dr. Hong also opined that although "[l]ifting, carrying, and handling heavy objects appear[ed] to aggravate her pain," Claimant did not have any "impairment related to sitting, standing, or walking." (R. 611.) Dr. Hong further noted that Claimant denied mood disturbances and had "no mental impairment." (R. 610-11.)

### 3. Joseph Beck, M.D.

From September through December 2006, Claimant was also treated by Dr. Joseph Beck for depression and other conditions. *Alesia II*, 2015 WL 5062812, at *2; *Alesia I*, 789 F. Supp. 2d at 927. Dr. Beck, a psychiatrist specializing in pain medicine, worked together with Dr. Hong to treat Claimant. (R. 610.)

In April 2007, Dr. Beck sent a psychiatric report to the Illinois Bureau of Disability Determination Services ("April 2007 report"), in which he reported seeing Claimant every two months. (R. 623-26.) According to the April 2007 report, Claimant suffered from dysphoria, anhedonia, lethargy, and generalized fatigue, and Dr. Beck diagnosed Claimant with major depressive disorder and fibromyalgia. (R. 623, 626.) The April 2007 report further indicated that although Claimant was able to perform work-related activities, she would need "an extremely variable workload to compensate for her intermittent symptoms." (R. 626.)

Later, in July 2007, Dr. Beck completed a mental impairment questionnaire ("July 2007 report"), where he indicated that he saw Claimant monthly for 30 minutes at a time. (R. 641-44.) In the July 2007 report, Dr. Beck opined, among other things, that Claimant had recurrent major depressive disorder of moderate severity; that she had moderate restrictions in daily living activities, moderate difficulties in maintaining social functioning, and frequent deficiencies of concentration, persistence, or pace; and that Claimant's impairments or treatment would cause her to be absent from work more than three times a month. (*Id.*)

### C. Claimant's Hearing Testimony

Claimant testified at each of the administrative hearings. (R. 33-51, 703-36, 1007-22.) Claimant testified that she had worked at Blue Cross Blue Shield for 21 years, starting as a claims adjudicator and then worked her way up to become an internal auditor and certified fraud examiner. (R. 34-35, 725-26.) She quit, though, in October 2006, because she was physically unable to get to work and to perform her work-related tasks. (R. 34-35, 45, 703-04, 726-27.) Claimant also testified that for her last three years at Blue Cross Blue Shield, she exhausted all her vacation time, sick days, and leave allowed under the Family and Medical Leave Act. (R. 703-04, 727-28.) During the last six months of her employment, Claimant was absent from work at least two weeks every month. (R. 728.) After she quit her job, Claimant continued receiving health insurance benefits through COBRA; however, after about six months, Claimant could no longer afford the monthly COBRA payments (which were approximately $600 per month), and she thereafter lost her insurance benefits. (*See* R. 45, 709, 723.)

### D. Prior ALJ Decisions and District Court Remand Opinions

In the first decision denying Claimant's DIB claim, ALJ Fina found that Claimant's depression caused mild limitations in her daily living activities, social functioning, and her concentration, persistence, or pace. (R. 16-17); *Alesia I*, 789 F. Supp. 2d at 933. ALJ Fina also determined that Claimant had the residual functional capacity ("RFC")[4] to perform sedentary work, limited by the following restrictions: Claimant required an option to sit down or stand up at will, provided that she not be taken off task more than ten percent of the work period; she should never crawl or climb ladders, ropes, or scaffolds; she could only occasionally stoop, crouch, kneel, reach overhead, and climb ramps or stairs; she should avoid concentrated exposure to unprotected heights; and she could frequently balance or engage in gross or fine manipulation of objects, although not continuously. (R. 19.) Assessing the opinions of Claimant's treating psychiatrist, Dr. Beck, ALJ Fina gave "some weight" to Dr. Beck's April 2007 report, as the findings were "fairly consistent with the record as a whole," and no weight to Dr. Beck's July 2007 report. (R. 16-18.)

On appeal, Judge Denlow remanded Claimant's case to the Commissioner for further proceedings. *Alesia I*, 789 F. Supp. 2d at 924. Finding that ALJ Fina's RFC determination failed to account for Claimant's mild limitations in daily living activities, social functioning, and concentration, persistence, or pace, Judge Denlow instructed the ALJ to incorporate restrictions into the RFC to address these impairments. *Id.* at 933-34. Judge Denlow did uphold ALJ Fina's assessment of Dr. Beck's April 2007 and July 2007 reports. *Id.* at 931-32.

---

[4] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

On remand from *Alesia I*, ALJ Ferrer reassessed Claimant's RFC. She found that Claimant could perform sedentary work, with the following limitations: Claimant required an option to alternate between sitting and standing at will, but would not be off task more than ten percent of the work period; she could not crawl or climb ladders, ropes, or scaffolds; she could occasionally stoop, crouch, kneel, balance, reach overhead, and climb ramps and stairs; she should avoid concentrated exposure to unprotected heights; she could frequently engage in gross or fine manipulation of objects; she could frequently interact with crowds and the public; she could constantly interact with co-workers; and she could concentrate and persist for two-hour segments. (R. 686.) Like ALJ Fina, ALJ Ferrer rejected Dr. Beck's July 2007 report and gave Dr. Beck's April 2007 report "some weight," as it was "fairly consistent with the record as a whole." (R. 684-85.) However, ALJ Ferrer did not specifically explain what weight she gave, if any, to Dr. McNett's reports. (*See, e.g.*, 684-85, 689-90.) ALJ Ferrer also found that Claimant's symptom statements were "not credible to the extent they [were] inconsistent with the overall evidence" that formed the basis of the RFC determination. (R. 687; *see also* R. 690 (finding Claimant's allegations "not fully credible" to the extent they alleged limitations greater than the assessed RFC).)

After Claimant appealed ALJ Ferrer's denial of benefits, Judge Feinerman remanded Claimant's case to the Commissioner for further proceedings. *Alesia II*, 2015 WL 5062812, at *1. In doing so, Judge Feinerman made several rulings or determinations relevant to the current appeal. First, he found that ALJ Ferrer failed to properly consider Dr. McNett's opinions—specifically his June 2005, July 2005, and March 2006 reports—which required reversal and remand. *Id.* at *5-6. Second, he

determined that, under the *law of the case* doctrine, Claimant could not challenge ALJ

Ferrer's decision to only give "some weight" to Dr. Beck's April 2007 report and no

weight to his July 2007 report, as this issue had already been resolved in the

Commissioner's favor during the first round of judicial review. *Id.* at *6-7. Third, he

determined that the ALJ did not adequately explain how her RFC determination was

consistent with Dr. Beck's finding (contained in his April 2007 report) that Claimant

required a "extremely variable workload." *Id.* at *7. Fourth, Judge Feinerman instructed

the ALJ to "*explicitly* consider whether [Claimant's] ailments caused her to miss work

and, if so, how that finding affects her RFC." *Id.* (emphasis in original). Lastly, he found

that substantial evidence supported the ALJ's determination regarding Claimant's

credibility, but that in making this determination, the ALJ failed to properly consider

Claimant's work history. *Id.* at *8-9. Thus, Judge Feinerman instructed the ALJ on

remand to consider how Claimant's work history affected her credibility. *Id.* at *9.

## II. Analysis

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence

and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940

(7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (citations and quotations

omitted). Although this Court must consider the entire administrative record, it will "not

'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its]

own judgment for that of the Commissioner.'" *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d

535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a 'critical review of the evidence'" and will not let the Commissioner's "decision stand 'if it lacks evidentiary support or an adequate discussion of the issues.'" *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure [the Court] that the ALJ considered the important evidence . . . [and to enable the Court] to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B. Analysis Under the Social Security Act

To qualify for DIB, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171,

1176 (7th Cir. 2001).  The claimant has the burden of establishing disability at steps one through four.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Here, the ALJ applied the five-step process to reach her decision denying Claimant's application for benefits.  At step one, the ALJ found that Claimant had not engaged in substantial gainful activity from her alleged disability onset date, November 3, 2006, through her date last insured ("DLI"), December 31, 2011.  (R. 890.)  At step two, the ALJ determined that Claimant suffered from the following severe impairments: fibromyalgia, degenerative disc disease of the lumbar spine, and hypothyroidism.  (R. 891.)  The ALJ also found that Claimant had several non-severe impairments: hypoglycemia, gastroesophageal reflux disease, recurrent yeast infections (candida), herpes, restless leg syndrome, irritable bowel syndrome, carpal tunnel syndrome, abnormal cholesterol levels, and major depressive disorder.  (*Id.*)  At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 899.)

Next, the ALJ assessed Claimant's RFC, finding that Claimant could perform sedentary work, limited by the following restrictions: Claimant required an option to alternate between sitting and standing at will, although she would not be off task more than ten percent of the work period; she could not crawl or climb ladders, ropes, or scaffolds; she could occasionally stoop, crouch, kneel, balance, reach overhead, and

climb ramps and stairs; she should avoid concentrated exposure to unprotected heights; she could frequently engage in gross or fine manipulation of objects; she could frequently interact with crowds and the public; she could constantly interact with co-workers; and she could concentrate and persist for two-hour segments. (R. 900.) Based on this RFC, the ALJ concluded at step four that Claimant could perform her past relevant work as an insurance claims auditor, as actually and generally performed, and as an internal auditor, as actually performed. (R. 909.) As a result, the ALJ did not proceed to step five, and she found Claimant was not disabled. (R. 909-10.)

Claimant now takes issue with the ALJ's decision for a number of reasons. The Court addresses each of Claimant's arguments in turn below, ultimately finding that the ALJ's opinion should be reversed and remanded for further proceedings.

### C. The ALJ Violated the *Law of the Case* Doctrine by Failing to Fully Comply with *Alesia II.*

Claimant first contends that the ALJ failed to follow the Court's prior remand orders in *Alesia I* and *Alesia II*. According to Claimant, the ALJ violated *Alesia I* by failing to set forth an RFC that accommodates her mild limitations in daily living activities, social functioning, and concentration, persistence, or pace. Claimant then asserts that the ALJ ignored *Alesia II*'s instruction to explicitly consider whether Claimant's ailments caused her to miss work and, if so, the effect on Claimant's RFC. Claimant further contends that the Commissioner's failure to substantively respond to this assertion waives any argument to the contrary. Lastly, Claimant argues that the ALJ failed to follow *Alesia II* by not analyzing how Claimant's work history impacted her credibility.

Claimant's arguments implicate the *law of the case* doctrine, which dictates that "once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case." *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991). The *law of the case* doctrine is equally applicable to judicial review of administrative decisions. *Id.* Thus, the ALJ was required, on remand from the Court, to conform the "further proceedings in the case to the principles set forth in" *Alesia I* and *Alesia II*, "unless there [was] a compelling reason to depart." *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998). Here, the Court finds that although the ALJ complied with *Alesia I*, she did not fully comply with *Alesia II*.

### 1. The ALJ Complied with *Alesia I.*

Again, ALJ Fina "found that Claimant's depression caused mild limitation in her activities of daily living; mild limitation in social functioning; and mild limitation in concentration, persistence, or pace." *Alesia I*, 789 F. Supp. 2d at 933. In *Alesia I*, Judge Denlow determined that ALJ Fina's RFC determination, which contained a requirement not to be off task more than ten percent of the work period, did not adequately address these limitations. *Id.* at 933-34; (R. 19.) Judge Denlow thus instructed the ALJ to incorporate the above limitations in the RFC. *Alesia I*, 789 F. Supp. 2d at 933-34. On remand from *Alesia I*, ALJ Ferrer added the following non-exertional restrictions to Claimant's RFC: Claimant could frequently interact with crowds and the public, constantly interact with co-workers, and concentrate and persist for two-hour segments. (R. 686.) Because ALJ Ferrer did not change her RFC assessment after *Alesia II*, the RFC at issue now on appeal contains these same restrictions. (*Compare id.* to R. 900.)

The Commissioner contends that the ALJ did not violate *Alesia I*, identifying the off-task restriction, the two-hour concentration and persistence restriction, and the crowd, public, and co-worker interaction restrictions. The off-task restriction, however, cannot satisfy *Alesia I*, as it was already incorporated into the RFC that was specifically rejected in *Alesia I*. If this restriction properly addressed Claimant's mild mental limitations, there would have been no need for Judge Denlow to remand on that issue.

Even so, it is evident that the restrictions added by ALJ Ferrer were intended to address Claimant's mild limitations resulting from her mental impairments. Aside from the fact that the RFC restrictions explicitly refer to concentration and persistence, the ALJ's opinion also tied these restrictions to Claimant's mild mental limitations, explaining that Claimant's "mental symptoms are accommodated for in the residual functional capacity limitation findings that [Claimant] could have frequently interacted with crowds and the public; she could have constantly interacted with coworkers; and she could have concentrated and persisted for 2-hour segments." (R. 906.) Reading the ALJ's opinion in context, the "mental symptoms" referred to are the mild mental limitations at issue.

Claimant contends that the ALJ did not support her two-hour concentration and persistence restriction with record evidence. But whether this restriction is supported by substantial evidence is a separate issue, which is discussed in more detail below. The question here is whether in determining her RFC, the ALJ ignored the instructions set forth in *Alesia I*. The Court concludes that she did not.

## 2. The ALJ Did Not Comply with *Alesia II.*

In *Alesia II,* Judge Feinerman instructed the ALJ to "*explicitly* consider whether [Claimant's] ailments caused her to miss work and, if so, how that finding affects her RFC." *Id.* (emphasis in original). According to the Commissioner, Claimant's contention that the ALJ ignored this instruction is "unpersuasive." (Dkt. 24 at 3.) Yet the Commissioner never explains why this is the case; instead, she only addresses Claimant's argument regarding *Alesia I.* (*See id.* at 3-5.)

In fact, the Commissioner only mentions Claimant's absence from work once, asserting that the ALJ "closely scrutinize[d] the nature of [Claimant's] discrete impairments in and around [her] cessation of employment and the alleged onset date, including whether *her impairment imposed prohibitive absenteeism.*" (*Id.* at 12 (emphasis added).) But the Commissioner cites 15 pages out of the ALJ's 24-page opinion to support this entire assertion, making it unclear where the ALJ scrutinized whether Claimant's ailments caused her work absences. (*See id.* (citing R. 891-96, 900-08).) The Commissioner's conclusory assertion and overly broad evidentiary citation do nothing to explain how or where the ALJ "explicitly" considered Claimant's work absences in connection with her RFC assessment, as instructed by *Alesia II.* This waives any argument that the ALJ complied with *Alesia II* on this basis. *See, e.g.,* *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (failure to respond to an argument results in waiver); *Kelly v. Colvin*, No. 14 C 1086, 2015 WL 4730119, at *5 (N.D. Ill. Aug. 10, 2015) (the Commissioner's failure to defend the ALJ's assessment on certain grounds waived those issues); *Moran v. Colvin*, No. 14 C 1634, 2015 WL 4148716, at *11-12 (N.D. Ill. July 9, 2015) (finding undeveloped arguments waived).

Judge Feinerman also instructed the ALJ to consider how Claimant's work history bears on her credibility. *Alesia II*, 2015 WL 5062812, at *9. Although the Commissioner concedes that the ALJ did not clearly comply with this instruction, she maintains that "the ALJ's decision nevertheless adequately addresses the Court's mandate when the decision is evaluated as a whole." (Dkt. 24 at 12.) The Court disagrees.

As with Claimant's work absences, citing almost two-thirds of the ALJ's opinion does nothing to show that the ALJ "closely scrutinize[d] the nature of Plaintiff's discrete impairments in and around Plaintiff's cessation of employment and the alleged onset date." (*Id.* (citing R. 891-96, 900-08).) Nor is the ALJ's compliance with *Alesia II* shown by her discussion about Claimant's pursuit of treatment after she lost her employer-sponsored insurance benefits. (*Id.* (citing R. 877, 901-02, 907).) The question on remand was whether Claimant's symptom allegations were credible once the ALJ accounted for her long work history, which suggests that Claimant would not quit her job—and lose her insurance benefits—unless her ailments were sufficiently debilitating. *See Alesia II*, 2015 WL 5062812, at *9 (noting that Claimant's "lengthy career could be said to suggest that her medical conditions, not some other motive, led her to quit working" and that Claimant "had good reason not to leave her job," as "she lost her employer-provided health insurance after she left"); *Alesia I*, 789 F. Supp. 2d at 934 (noting that the ALJ might question why "Claimant would walk away from a $50,000+ a year job with benefits that she depended on for her medical treatment" if she was still capable of working). This is a separate issue from why Claimant did or did not pursue treatment *after* she lost her insurance.

The Court is also not persuaded by the Commissioner's argument that because SSR 16-3p does not explicitly require consideration of an individual's work history, it matters less whether Claimant was generally motivated to work.  Both SSR 16-3p and its predecessor, SSR 96-7p,[5] refer to a claimant's "prior work record" and "efforts to work" as information relevant to evaluating a claimant's symptoms.  *Compare* SSR 16-3p, 2016 WL 1119029, at *6 (Mar. 16, 2016), *with* SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996); *see also McCammond v. Colvin*, No. 15 C 6589, 2016 WL 3595736, at *3 (N.D. Ill. July 5, 2016) (noting that "SSR 96-7p and SSR 16-3p are not patently inconsistent with one another").  Moreover, the relevance of a claimant's work history is not governed solely by SSR 16-3p or SSR 96-7p.  On multiple occasions, the Seventh Circuit has found a claimant's work history relevant to credibility without mentioning these or other Social Security Rulings.  *See, e.g.*, *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016); *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015); *Rainey v. Berryhill*, 731 F. App'x 519, 523 (7th Cir. 2018).

The ALJ's failure to adhere to the law of the case, as set forth in *Alesia II*, requires remand.  *See, e.g.*, *Daniels v. Colvin*, No. 15 C 9148, 2016 WL 7116582, at *12 (N.D. Ill. Dec. 7, 2016) (finding that the ALJ's violation of the *law of the case* doctrine was grounds for remand).  On remand, the ALJ shall explicitly consider whether Claimant's ailments caused her to miss work and, if so, how that finding affects

---

[5] When *Alesia II* was decided, SSR 96-7p applied.  *See Alesia II*, 2015 WL 5062812, at *9.  SSR 16-3p supersedes SSR 96-7p and its focus on "credibility," clarifying "that subjective symptom evaluation is not an examination of the individual's character."  *See* SSR 16-3p, at *1.  Last year, the Social Security Administration ("SSA") clarified that SSR 16-3p only applies when ALJs "make determinations on or after March 28, 2016," and that SSR 96-7p governs cases decided before March 28, 2016.  *See* Notice of Social Security Ruling, 82 Fed. Reg. 49462-03, 2017 WL 4790249, at n.27 (Oct. 25, 2017).  Because the ALJ issued her opinion on August 10, 2016 (R. 910), SSR 16-3p applied and will continue to apply on remand.  *See* Notice of Social Security Ruling, 82 Fed. Reg. 49462-03, at n.27.

her RFC. If the ALJ finds that Claimant's ailments did not cause her to miss work or that Claimant's work absences do not otherwise affect her RFC, she should specifically explain why she came to that conclusion. The ALJ shall also explicitly explain how Claimant's lengthy work history factored into her evaluation of Claimant's symptom allegations.

### D. The ALJ Failed to Build an "Accurate and Logical Bridge" Linking Her Concentration and Persistence RFC Restriction to Substantial Evidence.

Claimant asserts that the ALJ's finding that she could concentrate and persist for two-hour segments is not supported by record evidence. Specifically, Claimant argues that this RFC restriction is contradicted by evidence showing that she was unable to continue her job because of difficulties with concentration.

An RFC is an administrative assessment of what work-related activities an individual can perform despite her limitations that must be based upon the medical evidence and other evidence in the record. *See Dixon*, 270 F.3d at 1178; 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). When evaluating a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8p, at *7; *see Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (an ALJ's failure to explain how she arrived at her RFC conclusions alone "is sufficient to warrant reversal"). The ALJ is also required to build an "accurate and logical bridge" from the evidence to her RFC restrictions. *See Craft*, 539 F.3d at 677-78; *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004).

The Court agrees that the ALJ did not sufficiently support her two-hour concentration and persistence RFC restriction with record evidence. True, as the

Commissioner points out, the ALJ cited evidence demonstrating that in September 2005 Claimant's "mental fog" had decreased and that, as opined by two of Claimant's physicians, Claimant had no mental impairment and no difficulty with memory, information, calculation, or abstract thinking tests. (R. 385, 611, 624-25.) The Commissioner, however, fails to explain how this evidence supports the RFC restriction at issue, which does not involve memory or abstract thinking (as just two examples), but the ability to concentrate and persist in carrying out tasks. Nor did the ALJ explain how this or the other evidence she cited translates into a finding regarding Claimant's ability to concentrate and persist for any amount of time, let alone for the two-hour segments required by her RFC. (*See, e.g.*, R. 895, 898-99, 906.)

Thus, the Court finds that the ALJ did not build the requisite "accurate and logical bridge" to support her two-hour concentration and persistence RFC restriction. Remand is required on this ground as well. *See Briscoe*, 425 F.3d at 352 (failure to explain RFC restrictions is sufficient to require reversal).

### E.  On Remand, the ALJ Should Re-Evaluate the Weight to Give Dr. McNett's Opinions and Dr. Beck's "Extremely Variable Workload" Opinion.

Claimant asserts that the ALJ erred in not giving controlling weight to the opinions of her treating fibromyalgia specialist, Dr. McNett, or her treating psychiatrist, Dr. Beck. Claimant further asserts that even if these opinions do not deserve controlling weight, the ALJ did not properly weigh them in accordance with the regulatory checklist of factors found in 20 C.F.R. § 404.1527(c).

An ALJ must give controlling weight to a treating physician's opinion if it is both "well-supported" and "not inconsistent with the other substantial evidence" in the

record.[6]  20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).  Because a treating physician has "greater familiarity with the claimant's condition and circumstances," an ALJ may only discount a treating physician's opinion based on good reasons "supported by substantial evidence in the record."  *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003).

"Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion."  *Campbell*, 627 F.3d at 308.  To do this, the ALJ must, by regulation, consider a variety of factors, including: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the extent to which medical evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) whether the physician was a specialist in the relevant area; and (6) other factors that validate or contradict the opinion.  *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014); 20 C.F.R. § 404.1527(c)(2)-(6).

Here, Claimant has not demonstrated that any of Dr. McNett's or Dr. Beck's medical opinions are entitled to *controlling* weight.  On remand, however, the ALJ should re-evaluate the proper weight to give Dr. McNett's opinions and Dr. Beck's "extremely variable workload" opinion in accordance with the factors set forth in § 404.1527(c).

---

[6] Last year, the SSA adopted new rules for agency review of disability claims involving the treating physician rule.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017).  Because the new rules apply only to disability applications filed on or after March 27, 2017, they are not applicable in this case.  *See id.*

**1. Although Dr. McNett's Opinions Are Not Entitled to Controlling Weight, the ALJ Should Re-Evaluate Each Opinion in Accordance with 20 C.F.R. § 404.1527(c).**

While treating Claimant's fibromyalgia, Dr. McNett offered six medical opinions: the January 2004, September 2004, January 2005, June 2005, July 2005, and March 2006 reports.  (R. 395, 398-406, 490-92, 495.)  The ALJ specifically addressed many of these reports in her opinion.  (*See, e.g.*, R. 898 (July 2005 report); R. 902-03 (January 2004 report); R. 904 (July 2005 and March 2006 reports); R. 905 (June 2005, July 2005, and March 2006 reports).)  The ALJ then stated, in relevant part:

> Dr. McNett's multiple medical source statements provided in 2004 through the first half of 2006 including the June 2005, July 2005, and March 2006 statements . . . cannot be afforded great weight and indeed are afforded little weight because as discussed above, they do not reflect the longitudinal course of the record, particularly the claimant's improvement as of the latter-half of 2006 and the dearth of evidence to support ongoing symptomology, consistent with that which was alleged, in the subsequent years[.]

(R. 908.)

Claimant presents several arguments as to why the ALJ's assessment of Dr. McNett's reports was erroneous.  The Court addresses these arguments in turn.

**a. Claimant Has Not Shown That the ALJ Improperly Rejected Dr. McNett's Opinions Based on a Lack of Objective Evidence.**

Claimant first contends that the ALJ improperly rejected Dr. McNett's opinion evidence because she mistakenly believed that fibromyalgia can be assessed by typical objective signs.  Although it is true that fibromyalgia "cannot be measured with objective tests aside from a trigger-point assessment," *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017), Claimant fails to specifically identify anywhere in the ALJ's opinion suggesting that she, in fact, invalidated Dr. McNett's reports based on a lack of such objective evidence.  (*See* Dkt. 22 at 12; Dkt. 28 at 7.)  In summarizing why she gave Dr.

McNett's opinions little weight, the ALJ did not expressly identify a lack of "objective" evidence. Instead, she referred to a "dearth of evidence . . . in the subsequent years" without indicating whether the missing evidence consisted of objective test results, subjective complaints, or both. (R. 908.) Perhaps the ALJ was only referring to a lack of subjective evidence, e.g., evidence where Claimant reported symptoms to her doctors consistent with what she alleged in applying for disability benefits. And indeed, when the ALJ similarly identified a "dearth of subsequent evidence of ongoing symptomology" earlier in her opinion, she specifically referred to medical records where Claimant *subjectively* reported that her pain had improved. (R. 906 (referring to R. 1520, 1524).) In light of Claimant's failure to specifically point out any support for her assertion, the Court cannot say that a lack of objective evidence impermissibly influenced the ALJ's weighing of Dr. McNett's opinions.

### b. Claimant Has Not Shown That the ALJ Erred in Finding That Dr. McNett's Opinions Were Inconsistent with the Evidence.

Claimant next contends that the ALJ made several errors in determining that Dr. McNett's opinions were inconsistent with the evidence. The Court notes at the outset that Claimant does not explicitly identify which of Dr. McNett's opinions are addressed by her various arguments. Dr. McNett offered six medical opinions over two-plus years, and Claimant's broad references to Dr. McNett's "opinion evidence" or "opinion(s)" do not help facilitate the Court's review. (*See* Dkt. 22 at 12-14; Dkt. 28 at 7-9.) As such, the Court has addressed Claimant's arguments to the extent it could determine, based on context and Claimant's citations, which of Dr. McNett's statements are at issue.

First, Claimant argues that the ALJ erred in discounting Dr. McNett's January 2004 report based on Claimant's improved symptomology and her ability to work at

substantial gainful activity levels. Specifically, Claimant contends that (1) intermittent improvement is not inconsistent with a finding of disability or Dr. McNett's opinion (which stated that Claimant would need to miss work); and (2) the evidence shows that Claimant was missing work at a rate that would not be accepted by employers. Despite these contentions, Claimant never explains how the evidence relied upon by the ALJ in addressing Dr. McNett's January 2004 report reflected only "intermittent" improvement. Nor does Claimant adequately explain how the evidence contradicts the ALJ's finding that, as of January 2004, Claimant was able to work at substantially gainful activity levels. Although Claimant highlights testimony that she missed two weeks of work every month, this level of absenteeism took place in 2006, towards the end of Claimant's employment. (*See* R. 34, 728.) And Claimant does not make any effort to show that this same level of absenteeism was prevalent in January 2004, when Dr. McNett offered the report at issue.

Second, Claimant asserts that Dr. Mizera's July 2005 osteopathic evaluation, which the ALJ found contradicted limitations set forth in Dr. McNett's July 2005 report (R. 904), focused only on Claimant's neck and upper extremity conditions and still opined that Claimant would need breaks. Claimant, however, fails to explain why these aspects of Dr. Mizera's evaluation reflect an error by the ALJ.

Third, Claimant identifies the ALJ's reliance on notes and statements made by Dr. Hong between November 2006 and April 2007. These notes and statements indicate that Claimant improved with trigger point injections and that Claimant had no mental impairment or limitation in sitting, standing, or walking. (*See* R. 905.) The ALJ relied upon these notes and statements, at least in part, to reason that Dr. McNett's

June 2005, July 2005, and March 2006 reports were no longer accurate. (*See id.*) Claimant argues that Dr. Hong's notes only showed *temporary* improvement, which does not justify invalidating Dr. McNett's opinions. She also argues that the ALJ cherry-picked Dr. Hong's statements regarding her lack of mental impairment or sitting, standing, or walking limitations, which are inconsistent with the ALJ's own RFC restrictions and the state agency opinions.

The Court agrees that Claimant's improvement during the November 2006-April 2007 timeframe was temporary and, thus, not necessarily inconsistent with Dr. McNett's opinions. Trigger point injections gave Claimant two to four weeks of pain relief; after that, her pain returned. (*See* R. 612-14.) Indeed, Dr. Hong explicitly noted that these injections only provided "temporary, symptomatic relief." (R. 610.) The Court also agrees that Dr. Hong's statement regarding Claimant's lack of a mental impairment is inconsistent with her established mild limitations in daily living activities, social functioning, and concentration, persistence, or pace. *See Alesia I*, 789 F. Supp. 2d at 933; (R. 17, 897-99.) Further, Dr. Hong's statement regarding Claimant's ability to sit, stand, or walk without limitation is likewise inconsistent with the ALJ's RFC restriction requiring an option to alternate between sitting and standing at will. (R. 900.)

The ALJ, however, also provided other reasons for discounting Dr. McNett's June 2005, July 2005, and March 2006 reports. The ALJ noted that in late 2006, Claimant stated that she was considering taking yoga, even though she also stated that she was too busy to attend treatment sessions or physical therapy because she was starting a new business. (R. 905.) As the ALJ saw it, if Claimant "feels good enough to start up a business and good enough to consider starting yoga as she discussed with Dr. Hong, it

would seem illogical to assert that she remained incapable of sustaining work activity as she had previously been assessed in the medical source statements by Dr. McNett from June 2005, July 2005, and March 2006[.]" (*Id.*)  In addition, the ALJ noted that several assessments in the July 2005 report were unquantified and either inconsistent with or not supported by other statements Dr. McNett made regarding Claimant's mental functioning.  (R. 898.)  The ALJ further noted that Dr. McNett's March 2006 report was impugned by a "largely unremarkable assessment" he made the previous month.  (R. 904.)  As Claimant does not challenge or otherwise address these reasons, she has not demonstrated that they are illegitimate reasons for discounting Dr. McNett's June 2005, July 2005, and March 2006 reports.  Thus, the ALJ's reliance on Dr. Hong's statements regarding Claimant's improved condition and his perceived lack of certain limitations did not render her entire analysis flawed.

Lastly, Claimant contends the ALJ erred "to the extent [she] perceived an inconsistency between Dr. McNett's opinions and [Claimant's] lack of treatment after her job ended and with it her health insurance and ability to pay for health care." (Dkt. 22 at 13-14.)  But nowhere does Claimant identify any instance where the ALJ improperly discounted Dr. McNett's opinions by failing to consider her lack of insurance or her inability to pay for health care.  This perfunctory and undeveloped argument is waived. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016); *Moran*, 2015 WL 4148716, at *11-12.

In sum, because Claimant has not demonstrated that the ALJ erred in finding Dr. McNett's opinions inconsistent with the evidence, she has not shown that the ALJ was required to give Dr. McNett's opinions *controlling* weight.  *See Bauer v. Astrue*, 532 F.3d

606, 608 (7th Cir. 2008) (explaining that once there is evidence contradicting a treating physician's report, the "controlling weight" presumption "falls out").

### c. The ALJ Should Explicitly Re-Evaluate Each of Dr. McNett's Opinions in Accordance with 20 C.F.R. § 404.1527(c).

Even if Dr. McNett's opinions are not entitled to controlling weight, they "are still entitled to deference." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).[7] As such, the ALJ was required to address the checklist of factors found in 20 C.F.R. § 404.1527(c) to determine what weight to give those opinions. *See id.*; *Scrogham*, 765 F.3d at 697-98 & n.48 (explaining that the ALJ should have addressed the factors set forth in § 404.1527(c) and indicating that her failure to do so was not harmless); *Bauer*, 532 F.3d at 608 (noting that "the checklist comes into play" once an opinion is not given controlling weight).

Here, the ALJ generally justified her decision to give Dr. McNett's opinions "little weight" because (1) they did not reflect Claimant's longitudinal improvement, particularly as of the latter half of 2006; and (2) there was a lack of subsequent evidence to support ongoing symptomology. (R. 908; Dkt. 24 at 6.) These justifications generally address the supportability and consistency of Dr. McNett's opinions, which are two of the checklist factors. *See* 20 C.F.R. § 404.1527(c)(3)-(4). Moreover, the Court notes that the ALJ discussed Dr. McNett's treatment history from 2003 through 2006 and addressed instances during this timeframe where Dr. McNett saw Claimant. (*See* R. 902-04.) And at one point, the ALJ commented on the frequency with which Dr. McNett had seen Claimant at the time he offered his January 2004 report. (*See* R. 902-03.)

---

[7] The SSA has rescinded SSR 96-2p in connection with its new rules governing the analysis of treating physicians' opinions, but that rescission is effective only for claims filed as of March 17, 2017. *See* Notice of Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 2017 WL 3928298, at *1 (Mar. 27, 2017).

Thus, the ALJ at least touched upon the length of Dr. McNett's treatment relationship and the frequency of his examinations.  *See* 20 C.F.R. § 404.1527(c)(2)(i).

At the same time, Dr. McNett was a fibromyalgia specialist and the medical director of the fibromyalgia treatment center where Claimant was treated.  (*See, e.g.*, R. 410, 485.)  Although the ALJ may have understood that Dr. McNett treated Claimant for fibromyalgia, as the Commissioner contends, there is no indication that the ALJ acknowledged that Dr. McNett's specialty in treating fibromyalgia would tend to lend more credence to his opinions.  *See* 20 C.F.R. § 404.1527(c)(5) (physician's specialization).  Nor does it appear that the ALJ considered how the factors concerning the length of treatment and examination frequency would differ for each of Dr. McNett's six reports.  These factors might not weigh heavily in favor of Dr. McNett's January 2004 report, which was offered a few months into treatment and after a couple of visits, but they would be more favorable to Dr. McNett's later reports.  For instance, by the time Dr. McNett offered his March 2006 report, he had treated Claimant for two-and-a-half years and had seen Claimant approximately 15 times.  (*See, e.g.*, R. 292-93, 298-99, 301-25, 329, 332-33, 336-48, 385, 410, 412-14.)

By itself, the ALJ's analysis of Dr. McNett's reports may not have required remand.  Nonetheless, because the Court is remanding the case on other grounds, the ALJ should re-evaluate the weight to give Dr. McNett's January 2004, September 2004, January 2005, June 2005, July 2005, and March 2006 reports and, with respect to each report, specifically account for the factors set forth in 20 C.F.R. § 404.1527(c).

**2.  Although Dr. Beck's Opinions Are Not Entitled to Controlling Weight, the ALJ Should Re-Evaluate Dr. Beck's "Extremely Variable Workload" Opinion in Accordance with 20 C.F.R. § 404.1527(c).**

Claimant also argues that the ALJ erred in failing to give Dr. Beck's April 2007 and July 2007 reports controlling or, at least, proper weight. In light of the Court's prior decisions, however, neither report is entitled to controlling weight. In *Alesia I*, Judge Denlow upheld the ALJ's decision to give the April 2007 report "some weight" and to disregard the July 2007 report entirely. 789 F. Supp. 2d at 930-32. In other words, *Alesia I* affirmed the ALJ's decision to give these reports less than controlling weight. In *Alesia* II, although Claimant again argued "that the ALJ erred in giving 'some weight' to Dr. Beck's April 2007 report and 'no weight' to his July 2007 report," Judge Feinerman found these arguments foreclosed by the *law of the case* doctrine. 2015 WL 5062812, at *6-7. Claimant does not explain why, despite these rulings, she should be permitted to argue that the April 2007 and July 2007 reports should be given controlling weight. Thus, the Court similarly finds this argument foreclosed by the *law of the case* doctrine.

Turning to the proper non-controlling weight to be given to each report, Claimant's argument that the ALJ failed to properly weigh the July 2007 report is likewise foreclosed. *Alesia I* already upheld the ALJ's decision to give this report no weight, and Claimant does not provide any reason not to follow this ruling.

Whether the ALJ properly weighed the April 2007 report, however, presents a different situation. Although Judge Feinerman did not disturb the ALJ's decision to give the April 2007 report "some weight," he found that the ALJ failed to adequately explain how her RFC determination was consistent with the report's assessment that Claimant required an "extremely variable workload" in the workplace to compensate for her intermittent mental health and fibromyalgia symptoms. *Alesia II*, 2015 WL 5062812, at *2, *7; (R. 626, 895.) The ALJ was thus instructed to build a logical bridge connecting

this aspect of the April 2007 report to her RFC determination. *Alesia II*, 2015 WL 5062812, at *7; (R. 888.)

The ALJ, though, took a different route. Despite previously giving the entire April 2007 report "some weight" because it was "fairly consistent with the record as a whole" (R. 684), the ALJ now rejected the "extremely variable workload" aspect of the April 2007 report, giving it "little weight."[8] (R. 895, 905.) To support this rejection, the ALJ relied upon (1) the infrequency with which Dr. Beck saw Claimant; (2) the April 2007 opinion of Dr. Hong, who, after seeing Claimant more frequently than Dr. Beck, opined that Claimant had no mental impairment; and (3) the improvement in Claimant's condition with treatment and the lack of records evidencing significant impairment. (*Id.*) The Commissioner contends that because all these findings are supported by substantial evidence, the ALJ's evaluation of the "extremely variable workload" aspect of the April 2007 report should be upheld.

But certain aspects of the ALJ's reasoning give the Court pause. First, in rejecting the "extremely variable workload" aspect of Dr. Beck's opinion, the ALJ relied on Dr. Hong's April 2007 statement that Claimant denied mood disturbances and had no mental impairment. (R. 610-11, 895, 905.) Dr. Hong, however, is a pain management specialist who treated Claimant for her fibromyalgia and myofascial pain; there is no indication that Dr. Hong is a psychiatrist or that Dr. Hong's treatment focused on Claimant's mental capabilities or impairments. *See Alesia II*, 2015 WL 5062812, at *1; *Alesia I*, 789 F. Supp. 2d at 926; (R. 610-22.) To the contrary, Dr. Hong was

---

[8] Presumably, this led the ALJ to conclude that she no longer had to link the "extremely variable workload" requirement to her RFC assessment. *See Finney v. Berryhill*, No. 16 C 3815, 2018 WL 1377908, at *3 (N.D. Ill. Mar. 19, 2018) ("When determining a claimant's RFC, an ALJ need only incorporate those limitations which he finds are supported by the record.").

working in conjunction with Dr. Beck, a psychiatrist who specifically evaluated Claimant's mental capabilities and impairments.  (*See, e.g.*, R. 610, 623-26.)  In determining whether Claimant had a particular *mental* impairment justifying the "extremely variable workload" restriction, these factors would favor crediting Dr. Beck's opinion over Dr. Hong's.  *See* 20 C.F.R. § 404.1527(c)(2)(ii) (nature and extent of treatment relationship), (c)(5) (specialization); *see also Kelly*, 2015 WL 4730119, at *6 (indicating that a psychiatrist's opinion should be given greater weight than an internal medicine specialist's opinion).

Second, Dr. Hong's opinion that Claimant had no mental impairment is inconsistent with Claimant's established mild limitations in daily living activities, social functioning, and concentration, persistence or pace, which are caused by her depression.  *See Alesia I*, 789 F. Supp. 2d at 933; (R. 16-17, 897-99.)  This inconsistency would also favor Dr. Beck's opinion over Dr. Hong's, especially because Dr. Beck's April 2007 report recognized an impairment in Claimant's level of functioning with respect to daily activities (R. 623).  *See* 20 C.F.R. § 404.1527(c)(4) (consistency of medical opinion with the record).

Third, the Court is not convinced that Claimant's purportedly "good treatment efficacy" supports the ALJ's analysis.  (*See* R. 905.)  As noted above, Claimant's improvement was temporary; trigger point injections gave Claimant two to four weeks of pain relief from her fibromyalgia, after which her pain returned.  (*See* R. 610, 612-14.)  Indeed, the month after Dr. Beck offered his April 2007 report, Claimant reported increased pain after her last trigger point injections.  (R. 1530.)  The Court does not see how Claimant's temporary pain relief is inconsistent with Dr. Beck's opinion that

Claimant had intermittent fibromyalgia symptoms.  Fibromyalgia pain symptoms "may fluctuate in intensity and may not always be present," *Byndum v. Berryhill*, No. 17 C 01452, 2017 WL 6759024, at *5 (N.D. Ill. Dec. 15, 2017), and Claimant's symptoms could have intermittently cropped up once Claimant's relief from the trigger point injections waned.

These concerns, standing alone, may not have been grounds for remand. Moreover, the Court recognizes that the ALJ's consideration of the frequency with which Dr. Beck saw Claimant, as compared to Dr. Hong, was proper.  *See* 20 C.F.R. § 404.1527(c)(2)(i).  Nonetheless, because the Court is remanding the case on other grounds, the ALJ should note the Court's concerns and, on remand, re-evaluate the weight of the "extremely variable workload" aspect of the April 2007 report, specifically accounting for the factors set forth in 20 C.F.R. § 404.1527(c).  If, upon re-evaluation, the ALJ determines that this portion of the April 2007 report affects her RFC determination, she should ensure that both are linked by a logical bridge.  *See Alesia II*, 2015 WL 5062812, at *7; (R. 888.)

### F.  Except Regarding Her Work History, Claimant's Challenges to the ALJ's Credibility Determination Are Foreclosed by the *Law of the Case* Doctrine.

Claimant alleges that the ALJ made several errors in her credibility determination.  But *Alesia II* already addressed this aspect of the ALJ's findings.  Except for the ALJ's failure to address Claimant's work history, Judge Feinerman found that "substantial evidence supports the ALJ's determination regarding [Claimant's] credibility."  *Alesia II*, 2015 WL 5062812, at *8-9.  Thus, because Judge Feinerman resolved this issue in the Commissioner's favor during the prior round of judicial review,

the *law of the case* doctrine forecloses Claimant's attempts to again challenge the ALJ's entire credibility determination. *See id.* at *6.

Claimant contends that the *law of the case* doctrine is inapplicable because the *Alesia II* court required reconsideration of credibility on remand, making credibility still at issue. But Claimant reads the *Alesia II* instruction too broadly. On remand, credibility was only still at issue *to the extent* it involved Claimant's work history. Otherwise, the ALJ's credibility determinations were supported by substantial evidence, making them conclusive. *Alesia II*, 2015 WL 5062812, at *8; *see* 42 U.S.C. § 405(g).

### G. A Reversal Directing an Award of Benefits is Not Appropriate.

Finally, the Court turns to Claimant's request for a reversal directing an award of benefits. Claimant contends that this remedy is supported by the ALJ's failure to address her absenteeism, her concentration difficulties, the treating physician evidence, and the Commissioner's inability to sustain a denial after three attempts.

Reversal with an instruction to award benefits is only appropriate if "all factual issues have been resolved and the record can yield but one supportable conclusion." *Briscoe*, 425 F.3d at 355 (internal quotations omitted). On remand, the ALJ must craft an RFC—supported by substantial evidence—that complies with this Opinion. At this point, the Court cannot say that such an RFC would inevitably lead to a finding of disability. This is especially true because Claimant has failed to show that the treating physician opinions she seeks to rely upon are entitled to controlling weight. And although the Court recognizes the Commissioner's repeated failure to adequately support her denials of Claimant's claim, "[o]bduracy is not a ground on which to award benefits; the evidence properly in the record must demonstrate disability." *Id.* at 357;

*see also Israel v. Colvin*, 840 F.3d 432, 441-42 (7th Cir. 2016) (affirming the district court's decision to remand for a fourth administrative hearing because uncertainties remained in the evidentiary record). Because the Court does not believe that the current record conclusively demonstrates Claimant's disability, Claimant's motion is only granted insofar as it requests remand for further proceedings.

## III. Conclusion

For the foregoing reasons, Claimant's request for reversal (Dkt. 22) is granted and the Commissioner's motion for summary judgment (Dkt. 23) is denied. This case is remanded to the SSA for proceedings consistent with this Opinion. It is so ordered.

_____
**The Honorable Michael T. Mason**
**United States Magistrate Judge**

**DATED: August 16, 2018**